**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ADRIA ENGLISH-MARCEY,

*Plaintiff*,

-against-

DEFENDANT COMBS a/k/a "P. DIDDY, DIDDY, PUFF, PUFF, DADDY, PUFFY, BROTHER LOVE" (an Individual), BAD BOY ENTERTAINMENT HOLDINGS, INC. (a corporation), SEAN JOHN CLOTHING L.L.C., INC. (a corporation), COMBS GLOBAL ENTERPRISES (a corporation), and DOES 1-500, Inclusive,

*DEFENDANTS*

---

Case No.: 1:24-cv-05090

**FIRST AMENDED COMPLAINT**

(DEMAND FOR JURY TRIAL)

---

Plaintiff ADRIA ENGLISH-MARCEY ("PLAINTIFF" or "PLAINTIFF ENGLISH" or "Ms. ENGLISH"), by and through her attorneys, hereby alleges and avers of the DEFENDANTS SEAN COMBS a/k/a "P. DIDDY, DIDDY, PUFF, PUFF DADDY, PUFFY, BROTHER LOVE," ("COMBS"), BAD BOY ENTERTAINMENT HOLDINGS, INC. ("BBE"), SEAN JOHN CLOTHING LLC. ("SJC"), DEFENDANT COMBS GLOBAL ENTERPRISES ("CGE"), and DOES 1-500, (collectively referred to as "DEFENDANTS"), alleges as follows:

**PRELIMINARY STATEMENT**

1.     DEFENDANT COMBS is a man who exploited his position of wealth and influence to manipulate and exploit PLAINTIFF ENGLISH, reducing her dreams of stardom to a nightmare of servitude in sex slavery. DEFENDANT COMBS, a powerful figure in the music industry, used his power and influence to use force, and threats of force, to control, exploit, and

benefit financially from Ms. ENGLISH. DEFENDANT COMBS has a now documented history of abusing the women around him, corroborated by a video released to CNN on May 19, 2024, showing DEFENDANT COMBS physically abusing, battering and assaulting Ms. Ventura.[1] ENGLISH herself was threatened with and experienced similar physical violence. This case is not about misunderstandings or failed business ventures. It is about deliberate coercion, using violence and threats of violence to trap a young artist into a relationship where she was stripped of her independence and dignity, forced into what can only be described as modern-day slavery. DEFENDANT COMBS held her hostage to his whims, and his actions violated her rights and dignity. This case is about accountability. It is about making it clear that no amount of fame or fortune places anyone above the law.

## COMBS' HISTORY OF ALLEGED SEX TRAFFICKING

2.      In September 2024, DEFENDANT COMBS was indicted by a federal grand jury in Manhattan.[2] COMBS faces charges of Racketeering and Conspiracy, alleging he had multiple businesses whose members and associates engaged in crimes such as sex trafficking and forced labor, sex trafficking by force, fraud, or coercion, and transportation to engage in prostitution.

3.      DEFENDANT COMBS abused his power and has faced a long history of accusations of violence and illegal activity. Prior to recent cases being filed, DEFENDANT COMBS was named as a Defendant in a civil sexual assault lawsuit in Florida involving R&B Singer Tremaine Neverson a/k/a Trey Songz.[3]

4.      COMBS was also implicated in a lawsuit filed in California against an R&B

---

[1] https://www.cnn.com/2024/05/17/entertainment/video/sean-diddy-combs-cassie-venture-surveillance-digvid
[2] USA v. DEFENDANT COMBS - Sealed Defendant 1 - 1:2024cr00542
[3] 11th Judicial Circuit Court, Miami, Florida Case No.: 21-26889-CA-01

singer for a sexual assault that took place on a yacht anchored at COMBS' Star Island estate in Miami, Florida.[4]

5.    That same artist was also referenced in the lawsuit between Plaintiff Rodney Jones and DEFENDANT COMBS, which alleged the artist was "in Mr. Comb's Los Angeles home consorting with underaged girls and sex workers."[5]

6.    On November 16, 2023, Casandra Ventura a/k/a "Cassie" filed a 35-page lawsuit in which she alleged COMBS subjected her to nearly a decade of physical, sexual and emotional abuse punctuated by rape, sex trafficking, and being forced to engage in drug-fueled nonconsensual sexual encounters with other men.[6] Since Ms. Ventura's brave decision to file a lawsuit against COMBS, COMBS has accumulated numerous lawsuits against him across the country for the same conduct alleged by Ms. Ventura.

7.    Days after Ms. Ventura filed her action, more lawsuits were filed against COMBS. One such suit was brought by Plaintiff Joi Dickerson-Neal[7] and alleged that COMBS drugged and sexually assaulted her when she was a college student.

8.    At the same time, a third lawsuit was filed; this one against COMBS' companies and Defendant Harve Pierre, the longtime President of Bad Boy Entertainment Holdings, Inc. The suit alleged that Mr. Pierre used his position of power at Bad Boy to groom and sexually assault his former assistant, and that Bad Boy looked the other way at the time.[8]

9.    The fourth lawsuit filed against COMBS includes allegations brought by a Doe

---

[4] Superior Court of the State of California, County of Los Angeles Case No.: 22VECV00140
[5] United States District Court Southern District of New York Case No. 1:24-cv-1457, E.C.F 38 ¶ 29(j)
[6] United States District Court Southern District of New York Case No. 1:23-cv-10098
[7] Supreme Court of the State of New York, New York County Index No. 952341/2023
[8] Supreme Court of the State of New York, New York County Index No. 952246/2023

Plaintiff that are just as egregious as those brought by his prior victims, including that Plaintiff

Doe was sex trafficked, and gang raped by COMBS and various other individuals.[9]

10.     A fifth lawsuit was filed against COMBS and various other DEFENDANTS by

Plaintiff Rodney Jones and includes allegations of sexual assault, sex work, and sex and drug

trafficking, which were accomplished through an ongoing criminal enterprise and corrupt

organization,[10] similar to the claims PLAINTIFF files in this instant action.

11.     A sixth lawsuit was filed against COMBS and his son Christian Combs by Plaintiff

Grace O'Marcaigh.[11] Plaintiff in that suit alleges she was sexually assaulted and physically

harmed by the actions of Christian Combs and that COMBS aided and abetted in his son's tortious

conduct.

12.     A seventh lawsuit was filed against COMBS by model Plaintiff Crystal McKinney

alleging that she was "drugged and sexually assaulted" by COMBS.[12] The allegations in Plaintiff

McKinney's complaint echo similar claims filed by PLAINTIFF in the instant action.

13.     An eighth lawsuit was filed against COMBS by Plaintiff April Lampros.[13] In that

suit, Plaintiff Lampros alleges and accuses COMBS of battery, assault, negligent infliction of

emotional distress and violation of the New York Victims of Gender-Motivated Violence

Protection Law, again eerily similar to the claims made by PLAINTIFF herein.

14.     A ninth lawsuit was filed by Liza Gardner,[14] a talented up-and-coming musician.

In her complaint she alleges that COMBS targeted her, and her friend, plying them with drinks at

---

[9] United States District Court Southern District of New York Case No. 1:23-cv-10628
[10] United States District Court Southern District of New York Case No. 1:24-cv-1457
[11] Superior Court of the State of California, County of Los Angeles Case No.: 24STCV08571
[12] United States District Court Southern District of New York Case No. 1:24-cv-03931
[13] New York County Supreme Court Index No. 154859/2024
[14] GARDNER v. DEFENDANT COMBS et al - 2:2024cv07729

a party, before pinning them both down and raping them. Gardner further alleges that when she spoke out about it, COMBS assaulted and choked Gardner until she lost consciousness.

15.     A tenth lawsuit was filed by Dawn Angelique Richard,[15] a member of a girl group, Danity Kane, formed by COMBS, and later transitioned into a key member of DEFENDANT COMBS' band, Diddy – Dirty Money. Richard alleged that she witnessed COMBS brutally beat his girlfriend, Cassandra Ventura, by choking and strangling her, striking her with his hands and with objects, slapping her, punching her, and throwing items at her. Richard alleges she attempted to intervene by encouraging Ventura to leave COMBS and that each time COMBS learned of her efforts, he would threaten Richards. She further alleges that COMBS also exploited her musical talent by withholding her rightful earnings, stealing her copyrighted works, and subjecting her to years of inhumane working conditions, which included groping, assault, and false imprisonment, among other violations.

16.     Thalia Graves,[16] who was dating an executive at Bad Boy when she was 25 years old, filed a claim against COMBS. In her suit, Graves alleges that in or around the summer of 2001, COMBS requested to pick her up to discuss her boyfriend's supposed performance issues, where COMBS and his bodyguard Joseph Sherman proceeded to drug and viciously rape her. COMBS allegedly recorded this assault and showed the video to others including Graves' boyfriend at the time.

17.     Derrick Lee Cardello-Smith[17] also filed suit against COMBS for asexual assault that took place in 1997. He alleges that COMBS drugged and raped Cardello-Smith and that the

---

[15] Richard v. DEFENDANT COMBS et al - 1:2024cv06848
[16] United States District Court Southern District of New York Case No. 1:2024cv07201
[17] Cardello-Smith v. DEFENDANT COMBS - 5:2024cv12647; Cardello-Smith v. DEFENDANT COMBS et al - 2:2024cv12737

rape kit taken after Cardello-Smith sought medical attention was held in the possession of Kym Worthy since 1997 and was only tested in April 2024. The results allegedly showed the semen and other biological fluids of Cardello-Smith and COMBS.

18.    A Jane Doe[18] filed suit alleging that in or around June 1995 she attended a promotional party at Elks Plaza in New York City where COMBS saw Doe dancing and asked to speak with her privately. Once alone in a bathroom, it is alleged that he forcefully kissed her and when she tried to resist, he hit her and slammed her against the wall causing her to fall on the ground. She further alleges that COMBS hit her again and then raped her vaginally, before threatening her if she reported the abuse.

19.    Another lawsuit was filed by John Doe,[19] who was employed as security for one of COMBS' "White Parties" in 2006. It was alleged that, at the party, COMBS drugged and anally raped John Doe in a van.

20.    Another Jane Doe[20] filed suit against COMBS for an assault that took place in 2004, when she was 19 after attending a photoshoot in Brooklyn, New York. Jane Doe alleged that she had been invited to an exclusive afterparty at COMBS' hotel before attending a more informal afterparty where she and her friend were taken to COMBS' room by a security guard and the door was locked. It is alleged that COMBS instructed them to imbibe cocaine that he had prepared for use on the coffee table. COMBS is then alleged to have forced Doe's friend to perform oral sex on him or else he would have them both killed. It is alleged that COMBS raped Doe who was only able to escape because of the interruption of a security officer responding to her screams.

---

[18] United States District Court Southern District of New York Case No. 1:2024cv07777
[19] United States District Court Southern District of New York Case No. 1:2024cv07776
[20] Doe v. DEFENDANT COMBS et al - 1:2024cv07769

21.    John Doe,[21] who worked for Royal Reigns Management, also brought suit against COMBS. In his complaint he alleges that COMBS' business associates took John Doe to a party in NYC where he was offered and declined ecstasy. It is alleged Doe was then drugged and taken to a bedroom where he was sodomized by multiple men, including COMBS.

22.    Another John Doe[22] who worked as an advisor for Ecko Clothing in 2008 filed suit. In his suit he alleges that in or around May 2008, Doe was in the stockroom at Macy's flagship store at Herald Square in Manhattan, when COMBS and three of his bodyguards entered the stockroom. COMBS is alleged to have orally copulated Doe and then threw his head to the side and threatened him to shut up or he would kill him.

23.    A lawsuit was filed against COMBS by John Doe,[23] who alleges that in 1998, at age 16, he was recruited to COMBS' "White Party" at his mansion in the Hamptons. COMBS allegedly took interest in him, and they walked towards portable restrooms. It is alleged COMBS forced Doe to expose his penis for COMBS to inspect and then COMBS grabbed Doe's penis and genitals and said his people would be in contact.

24.    Ashley Parham[24] accused COMBS of sexual assault and battery, abuse, false imprisonment and kidnapping. She claims to have virtually met COMBS in February 2018 when a man she'd met at a bar started a FaceTime call with the Bad Boy Records founder outside the bar. Parham's lawsuit alleged that the man from the bar "set her up" to be assaulted by COMBS the following month. It is alleged that on March 23, 2018, at the man's apartment, COMBS threatened Parham with a knife, and along with several unknown accomplices, raped her.

---

[21]United States District Court Southern District of New York Case No. 1:2024cv07772
[22]United States District Court Southern District of New York Case No. 1:2024cv07774
[23]United States District Court Southern District of New York Case No. 1:2024cv07778
[24]United States District Court Northern District of California Case No. 3:2024cv07191

25.    John Doe[25] brought suit against COMBS, alleging that in or around 2022, during a promotional party for the launch of COMBS' Ciroc vodka drink, COMBS sexually assaulted Doea businessman from the Los Angeles area and owner of his family business. Doe alleges that over the years prior, he had established a business relationship with COMBS, who was a customer of his rental business. It is alleged that COMBS invited Doe to his private office where they were alone; COMBS then exposed his genitals to Doe and grabbed Doe's genitals through his pants and squeezed them in a rough and sexual manner. Doe alleges he was saved by a professional athlete entering the room.

26.    On or around September 7, 2000, Jane Doe,[26] then 13 years old, alleges that she had a friend drop her off at Radio City Music Hall in New York City so she could try to attend the Video Music Awards (VMAs). It is alleged that COMBS' limo driver invited her to an afterparty after letting her know COMBS liked younger girls and "fit what Diddy was looking for." Doe alleges she was forced to sign an NDA, observed widespread drug use, including marijuana and cocaine, and she was drugged and entered an empty bedroom to lie down when COMBS entered with a male and female celebrity. She further alleges that the male celebrity removed her clothes and vaginally raped her while the female celebrity watched, then COMBS vaginally raped her while both celebrities watched. COMBS is alleged to have attempted to force Doe to perform oral sex on him, but she resisted by hitting COMBS in the neck, after which he stopped. She alleges she was then able to walk out of the room.

27.    In another suit, COMBS is accused of drugging personal trainer John Doe[27], passing him around 'Like a Party Favor' to stars. Doe alleges that he was drugged with a single

---

[25]United States District Court Southern District of New York Case No. 1:2024cv07973
[26]United States District Court Southern District of New York Case No. 1:2024cv07975
[27]United States District Court Southern District of New York Case No. 1:2024cv07974

beverage that he had to drink as a condition for entry. It is further alleged that COMBS performed non-consensual oral sex on Doe and that COMBS forced Doe to perform oral sex on another individual. Doe alleges that other individuals at the party forced Doe to perform sexual acts as well.

28.     Jane Doe[28] filed suit against COMBS for a rape that took place in Las Vegas in 2014. It is alleged that while attending a party in Las Vegas, COMBS directed Doe to drink a beverage, and she was drugged, and that COMBS raped her while she was unconscious.

29.     Jane Doe[29] filed suit for a rape and sexual assault that took place in 2022. Doe alleges that she was invited to a party where attendees were pressured to consume the drugs, but she declined. Doe further alleges that she consumed one glass of wine and was later invited by COMBS to his office. It is alleged that COMBS drugged her and proceeded to rape and sexually assault her in his office.

30.     Candice McCrary[30] brought suit for an assault that took place at a party in 2004. McCrary alleges that she was at COMBS' photoshoot when he instructed her to imbibe cocaine but she refused. It is alleged that COMBS raped McCrary and stopped once a security guard heard her cries. She further alleges that COMBS left, but she was forced to sit alone in a dark room by herself for half an hour before being dismissed.

31.     Jane Doe,[31] brought suit alleging that, in 2001, age 18 at the time, she attended a Halloween party at a Club in New York. It is alleged that COMBS' security guards escorted Doe and her friends to a limousine that COMBS was in where she was drugged and ordered by

[28]United States District Court Southern District of New York Case No. 1:2024cv07977
[29] United States District Court Southern District of New York Case No. 1:2024cv08024
[30] United States District Court Southern District of New York Case No. 1:2024cv08054
[31] United States District Court Southern District of New York Case No. 1:2024cv08808

COMBS to perform oral sex on a security guard. The security guard is alleged to have forced her to remove her shirt, fondled her breasts, and forced oral copulation. It is alleged that COMBS ordered Doe and two other women to take turns performing oral sex on each man. Doe alleges that COMBS forced Doe to perform oral sex on himself.

32.     John Doe[32] alleges that in 2022 he attended a nightclub in Miami and was invited to an after-hours event hosted by COMBS. Doe alleges that he was approached by COMBS' associate and taken upstairs to meet COMBS. He further alleges that COMBS gave Doe a drink and he was brought to a bedroom where three men and two women were also present. Doe alleges that he lost consciousness and  woke up naked with a sharp pain in his rectum and anus while COMBS was raping him. Doe alleges that he slipped back into a state of unconsciousness and awoke the next morning when COMBS' security team then escorted Doe off the residence.

33.     John Doe[33] alleges that in 2001 he was cast for a music video in New York where he was met by the casting director and COMBS' assistant or bodyguard at a hotel. He alleges that COMBS eventually arrived and Doe was drugged and then passed out. He further alleges that he awoke to being sodomized by COMBS on an ottoman and was held down by one of COMBS' bodyguards by the arms, recalling a camera flashing before passing out again. Doe alleges that he passed out and regained consciousness several more times; once when he believes there was a metal device holding his mouth open and a man forced him to perform oral sex on him, at which time he passed out again. Doe alleges that when he finally regained consciousness again he was completely naked, and saw others engaging in sex acts, drinking, and smoking. Doe was then able to escape.

---

[32] United States District Court Southern District of New York Case No. 1:2024cv08810
[33] United States District Court Southern District of New York Case No. 1:2024cv08812

34.     It is alleged that in 2004, Jane Doe,[34] who was 17 years old at the time, was approached by two men at a modeling gig that gave her a flyer for a party. Doe alleges that at the door of the party, COMBS' staff required her to hand over her purse and cell phone, that she was drugged, lost consciousness, and awoke to her underwear missing with vaginal and anal pain. She further alleges that COMBS and two of his bodyguards approached her and threatened her by telling her she would be in danger if she spoke about what occurred. She was coerced to agree not to contact the police in exchange for her purse and cell phone. DeWitt Gilmore[35] brought suit against COMBS for a 1996 assault at the hands of COMBS and his associates as he was leaving a club in New York City, New York. Gilmore alleges that COMBS threatened him with violence, and Gilmore was surrounded by vehicles with armed associates to block his car. Gilmore alleges that COMBS' associates fired shots, a car chase ensued, and fortunately he was able to escape. Due to these numerous lawsuits filed against COMBS alleging the same or similar acts, there is now a growing awareness that COMBS was engaging in far more sinister acts than previously known, including physical abuse and sex trafficking. PLAINTIFF's allegations mirror those brought forth by DEFENDANT COMBS' other victims, as well as the criminal conduct DEFENDANT COMBS is charged with participating in. Specifically, from in or about 2004 through 2013, PLAINTIFF ENGLISH was sex trafficked by DEFENDANT COMBS and DEFENDANT DOES 1-500.

35.     PLAINTIFF has lived her adult life with the memories of being trapped in a cycle of sex trafficking she never asked to be a part of and was chosen because DEFENDANT COMBS knew he could groom, manipulate, molest and control her. For years, as a direct result of

---

[34] United States District Court Southern District of New York Case No. 1:2024cv08813
[35] United States District Court Southern District of New York Case No. 1:2024cv08440

DEFENDANTS' actions, and each of them, PLAINTIFF has suffered extreme emotional distress, impacting nearly every aspect of her life and personal relationships. Given all the brave individuals who have come forward against DEFENDANT COMBS, PLAINTIFF found the courage to come forward.

36.     PLAINTIFF brings this action seeking monetary relief against DEFENDANTS for violations of the Trafficking Victims Protection Act , 18 U.S.C § 1595 ("TVPA"), for sexual harassment and sexual assault; for violations of the Victims of Gender-Motivated Violence Protection Law, Gender Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq.* ("VGMVPL"), for premises liability, negligence, for negligent infliction of emotional distress, for intentional infliction of emotional distress, and for battery.

## JURISDICTION AND VENUE

37.     This Court has personal jurisdiction over the DEFENDANTS under and consistent with the Constitutional requirements of Due Process in that the DEFENDANTS, acting directly or through their agents or apparent agents, committed one or more of the following:

a.     The transaction of any business within the state;

b.     The making of any contract within the state;

c.     The commission of a tortious act within this District; and

d.     The ownership, use, or possession of any real estate in this state.

38.     As of the date of this filing, DEFENDANTS, and each of them, have consistently and purposefully availed themselves of the privilege of conducting activities within New York, thus invoking the benefits and protections of New York law. In return for these benefits and protections, DEFENDANTS must submit to the burdens of litigation in New York.

39.     This litigation arises from and relates to the tortious activities the DEFENDANTS,

and each of them, visited upon PLAINTIFF in New York. This tortious conduct violated 18 U.S.C. § 1591, 18 U.S.C. § 2255, and 18 U.S.C. § 2422.

40.    Requiring DEFENDANTS to litigate these claims in this District does not offend traditional notions of fair play and substantial justice. PLAINTIFF's claims arise from conduct occurring by DEFENDANTS in New York, specifically, the trafficking of PLAINTIFF across State lines between New York, Florida, California and Nevada.

41.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 for original jurisdiction over civil actions where the matter in controversy exceeds to the sum and value of $75,000 and is between citizens of different states. This Court has subject matter jurisdiction over this matter under 15 U.S. Code § 1591 because one claim at issue arises under TVPA. This Court also has subject matter jurisdiction under 28 U.S. Code § 1332 and supplemental jurisdiction under 28 U.S. Code § 1367 because the state law claim forms part of the same case and controversy as the claim arising under the federal statute.

42.    Pursuant to 28 U.S.C. § 1391(b), (c) and § 1400(a), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, alleged herein, occurred in this district.

## DEFENDANT PARTIES

### I.    DEFENDANT SEAN "DIDDY" COMBS

43.    DEFENDANT COMBS is currently a citizen of Florida.

44.    At all times relevant to the allegations of this Complaint, DEFENDANT COMBS was a citizen and resident of the State of New York.

45.    DEFENDANT COMBS is a rapper and record executive popularly known by his stage names: Puff Daddy, Puffy, Puff, P. Diddy, Diddy, Brother Love or Love. DEFENDANT

COMBS rose to prominence and power in the music and entertainment industry over the last three decades. COMBS is a Grammy-awarded musician, rapper and producer. He founded co-DEFENDANTS BBE, SJC, and CGE.

46.    DEFENDANT COMBS has signed, through BBE, some of the biggest stars in music including Rick Ross, Machine Gun Kelly, Notorious B.I.G., New Edition, Mase, Pitbull, Lil John, Fabolous, French Montana, and groups like Danity Kane, 112, and Total, to name just a few.[36]

47.    In 2008, DEFENDANT COMBS was the first male rapper to be commemorated with a star on the Hollywood Walk of Fame.

48.    DEFENDANT COMBS "founded Bad Boy Records in 1992, and the company has sold over 500 million records, produced 38 platinum albums, and won multiple Grammy Awards" according to the official website of DEFENDANT CGE.[37]

49.    COMBS is one of the richest artists in the world. In 2023, in a statement from a former business associate revolving around a dispute over an alcohol brand co-owned by COMBS, it was reported COMBS made over $1 billion just from that single business venture.[38]

50.    Upon information and belief, DEFENDANT COMBS has a long history of committing physical and sexual violence against women and men, both adults and juveniles, as documented and publicly available in over forty federal lawsuits across the country, as well as extensive media coverage on the lawsuits and the allegations made therein.

51.    COMBS subjected his victims to physical, emotional, and verbal abuse to coerce,

---

[36] https://www.ranker.com/list/bands-and-musicians-on-bad-boy-records/music-lover
[37] https://combsglobal.com/bad-boy-entertainment/
[38] https://www.forbes.com/sites/lisettevoytko/2022/02/09/the-highest-paid-entertainers-2022/

threaten, manipulate, and demand his victims to engage in "Freak Offs." "Freak Offs" were elaborate parties where DEFENDANT COMBS produced sex performances that DEFENDANT COMBS arranged, directed, masturbated during, and often electronically recorded.

52.    DEFENDANT COMBS maintained control over his victims through, among other things, physical violence, false promises of career opportunities amounting to fraud, granting and threatening to withhold financial support, and by other coercive means, including tracking their whereabouts, dictating his victims' appearance, monitoring their medical records, controlling their housing, and supplying them with controlled substances without their consent.

53.    COMBS used his position of notoriety and power to intimidate, threaten, and lure female victims into his sex trafficking enterprise, often under the pretense of a romantic relationship, opportunity for career advancement, or both. DEFENDANT COMBS then used force, threats of force, and coercion, to cause victims, including PLAINTIFF, to engage, and continue to engage, in elaborate sex acts with other guests at parties that DEFENDANT COMBS referred to as, among other things, "Freak Offs."

54.    During these "Freak Offs", DEFENDANT COMBS distributed a variety of controlled substances to victims, in part to keep the victims obedient and compliant. Often unbeknownst to the victims, including PLAINTIFF, DEFENDANT COMBS kept videos he filmed of victims engaging in sex acts with partygoers.

55.    In arranging these "Freak Offs", DEFENDANT COMBS transported, and caused to be transported, unsuspecting individuals across state lines to act as commercial sex workers, including PLAINTIFF.

56.    Upon information and belief, Tamiko Thomas ("Ms. Thomas"), who may also be known as Tamiko Trapp or by another alias, at all relevant times, was an employee of

DEFENDANT COMBS and BBE. Ms. Thomas was at all times alleged herein under the control of her dominant principal, DEFENDANT COMBS. At all times herein alleged, each of the acts of Ms. Thomas were on behalf of, for the benefit of, at the direction of, and at the behest of DEFENDANT COMBS and were ratified by DEFENDANT COMBS.

57.     The nature of Ms. Thomas' relationship with DEFENDANT COMBS is akin to that of Ghislaine Maxwell to Jeffrey Epstein. Ms. Thomas wielded the power and prestige of DEFENDANT COMBS' power and influence to intimidate, threaten, and lure female victims into DEFENDANT COMBS' orbit, often under the pretense of a romantic relationship or opportunity for career advancement. COMBS then used force, threats of force, and coercion, to cause victims to engage in elaborate sex acts with other guests at parties on DEFENDANT COMBS' behalf at his "Freak Offs."

58.     Ms. Thomas was responsible for recruiting PLAINTIFF to work at DEFENDANT COMBS' "White Parties", "Freak-Off Parties", and the other social events he hosted where he forced PLAINTIFF to have nonconsensual sexual contact with partygoers. Ms. Thomas lured PLAINTIFF ENGLISH into DEFENDANT COMBS' sex trafficking ring operation under the guise of recruiting PLAINTIFF to be a Go-Go dancer at DEFENDANT COMBS' parties and by perpetuating DEFENDANT COMBS' false promise to PLAINTIFF that she would be signed by DEFENDANT COMBS' record label, BBE, and her boyfriend Anthony Gallo would book a SJC modeling campaign. Unbeknownst to PLAINTIFF, she was really being recruited by DEFENDANT COMBS and Ms. Thomas to be marked to the other party goers as a sex slave who could be bought through DEFENDANT COMBS or Ms. Thomas. These false promises amounted to fraud. While the exact name she used may have varied, PLAINTIFF believes that the individual known to her as Ms. Tamiko Thomas is the individual who recruited PLAINTIFF on behalf of

DEFENDANT COMBS. Once Ms. Thomas had successfully brought PLAINTIFF into COMBS'
orbit using this ruse, COMBS then used violence and threats of violence, among other techniques
alleged herein, to trap PLAINTIFF in his sex trafficking ring.

59.    Ms. Thomas, in her employment capacity, was responsible for recruiting,
scheduling, transporting, dressing, and making payment to PLAINTIFF for her dancing and
nonconsensual commercial sex acts in furtherance of DEFENDANT COMBS' corrupt sex
trafficking enterprise and on behalf of DEFENDANT COMBS.

**II.     DEFENDANT BAD BOY ENTERTAINMENT HOLDINGS, INC.**

60.    DEFENDANT BBE is a domestic business corporation licensed to do business in
New York and headquartered at 1440 Broadway, Third Floor, New York, NY 10018. BBE is a
domestic business corporation and has been licensed to do business in New York since 1992.

61.    DEFENDANT BBE is a music, media, and entertainment company founded and
owned by DEFENDANT COMBS. As alleged herein, DEFENDANT BBE has been dominated
by the principal and founder DEFENDANT COMBS and used to facilitate and participate in the
crimes and acts inflicted against PLAINTIFF. Indeed, the pattern of COMBS using BBE and its
associates to carry out his trafficking and abuse of victims, and other crimes, is a theme present
throughout many of the cases filed to date.

**III.    DEFENDANT SEAN JOHN CLOTHING LLC**

62.    DEFENDANT SJE is a domestic liability company licensed to do business
in New York. It is headquartered in New York City, New York.

63.    In 1998, DEFENDANT COMBS founded SJE, which has retail sales of over $450
million. As CEO and president of the company, DEFENDANT COMBS represented SJE when he
conspired and sex trafficked PLAINTIFF.

64.     Upon information and belief, DEFENDANT COMBS used modeling campaigns, and the promise of obtaining jobs for modeling, for his clothing brand SJE to search for, lure and coerce potential trafficking victims into his sex trafficking enterprise.

## IV.    DEFENDANT COMBS GLOBAL ENTERPRISE

65.     DEFENDANT CGE is a domestic liability company licensed to do business in New York with its principal place of business located in New York City, New York.

66.     CGE is a business conglomerate founded by DEFENDANT COMBS with a pervasive presence in the music, entertainment, fashion, spirits, and television industries, and which includes a diverse portfolio of business and investment interests in fragrance, marketing, media properties and liquor.

## IV.    DOE DEFENDANTS 1-500

67.     The true names or capacities, whether individual, corporate, or otherwise, of DEFENDANT DOES 1 through 500, inclusive, are unknown to PLAINTIFF who is therefore ignorant of the true names and sues said DEFENDANTS by such fictitious names. PLAINTIFF believes and alleges that each of the DEFENDANTS designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and which caused damages proximately and foreseeably to PLAINTIFF as alleged herein. The true names, whether corporate, individual or otherwise, of DEFENDANTS 1 through 500, inclusive, are presently unknown to PLAINTIFF, who therefore sues said DEFENDANTS by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when same have been ascertained, pursuant to CPLR § 1024.

68.     The limitations Article 16 of the CPLR do not apply because one or more of the exceptions set forth in CPLR § 1601 and/or § 1602 apply.

69.     At all times hereinafter alleged, "DEFENDANTS" or "All DEFENDANTS" include all herein named DEFENDANTS as well as DEFENDANTS DOES 1 through 500, inclusive.

70.     At all times herein alleged, each of the DEFENDANTS was the agent, servant, partner, aider and abettor, co-conspirator and joint venturer of each of the remaining DEFENDANTS herein and was at all times operating and acting within the course, purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture and rendered substantial assistance and encouragement to the other DEFENDANTS, knowing that their conduct constituted a breach of duty owed to PLAINTIFF and unlawful harm to PLAINTIFF.

## PLAINTIFF PARTY

### ADRIA ENGLISH-MARCEY

71.     PLAINTIFF is an individual who is a citizen of the United States and currently a resident of California.

72.     PLAINTIFF, at all times relevant to the action, resided and was domiciled in the State of New York.

73.     At all times relevant herein, PLAINTIFF lived with her then-boyfriend, an aspiring male model and music artist, Anthony Gallo.

74.     While PLAINTIFF's then-boyfriend auditioned for modeling gigs and attended go-sees in New York, PLAINTIFF began "Go-Go" dancing and performing at an upscale club in Midtown Manhattan frequented by celebrities and leaders of the entertainment industry. PLAINTIFF performed while pursuing her ultimate goal of becoming a musician and rap artist. PLAINTIFF developed a reputation as a well-known and highly sought-after dancer.

75.     In or about mid-2004, PLAINTIFF accompanied Mr. Gallo at an audition for a SJE

modeling campaign in New York City, New York.

76.    During the SJE clothing audition, Mr. Gallo was told that he and another model were required to perform fellatio on DEFENDANT COMBS in exchange for the opportunity to book the modeling campaign. Mr. Gallo vehemently refused and left the audition.

77.    Having heard of PLAINTIFF's reputation as a talented dancer, DEFENDANT COMBS later sent  Ms. Thomas to revisit Mr. Gallo with a new offer: that he could book the SJE campaign if he helped  Ms. Thomas convince PLAINTIFF to work as a "Go-Go" dancer at DEFENDANT COMBS' upcoming "White Party" in the Hamptons.

78.    DEFENDANT COMBS then arranged for Ms. Thomas to meet directly with PLAINTIFF, Anthony Gallo, and another man who was sent to represent BBE's interests: Harve Pierre. Harve Pierre was the head of the Artists and Repertoire department of BBE at the time, acting as a talent scout on behalf of the label who was meant to further legitimize the offer of career advancement DEFENDANTS were making to PLAINTIFF. The meeting took place at a lounge in the Lower Eastside of New York City. By and through his representatives Ms. Thomas and Pierre, DEFENDANT COMBS convinced PLAINTIFF that she would advance her boyfriend's modeling career and her own music career if she worked the "White Parties" as a dancer. In an effort to assist Mr. Gallo's desire to become a model, PLAINTIFF agreed to what she believed to be legitimate employment with DEFENDANT COMBS and BBE as entertainment at the "White Parties" and other parties hosted by DEFENDANT COMBS at his residences in the Hamptons, NY and Miami, FL from 2004-2009.

79.    After the first White Party, PLAINTIFF was forced and coerced into having sexual contact with guests at each of the dozens of social events DEFENDANT COMBS and DEFENDANT Ms. Thomas brought her to parties across the United States, including in

California, New York, Florida, and other locations.

80.    With each event, PLAINTIFF was fraudulently promised that she would be signed by DEFENDANT COMBS' recording company, BBE, as a rap artist and that DEFENDANT COMBS would help PLAINTIFF kick-start her music career.

81.    At nearly every event PLAINTIFF attended hosted by DEFENDANT COMBS after the first White Party, PLAINTIFF was drugged by DEFENDANT COMBS and left incapacitated to more easily allow COMBS and others to rape and sexually exploit PLAINTIFF.

82.    PLAINTIFF became caught in DEFENDANT COMBS' sex trafficking web where she saw other victims and successful figures in society at the parties acting as though this sexual exploitation and drugging was the norm and the necessary price for a successful career in the music industry.

83.    When PLAINTIFF attempted to flee the sex trafficking ring, DEFENDANT COMBS used violence, threats, and intimidation to silence PLAINTIFF. He told PLAINTIFF on numerous occasions that if she ever spoke about any of the severe harm she had endured, he would kill her. DEFENDANTS also used violent demonstrations of brutality against other victims to further intimidate PLAINTIFF into silence and to lend credence to his violent threats.

## FACTUAL ALLEGATIONS

### PLAINTIFF's Employment at DEFENDANT COMBS' Labor Day "White Party" in 2004

84.    As agreed upon between Mr. Gallo,  DEFENDANT COMBS, Ms. Thomas, and PLAINTIFF, PLAINTIFF began her employment as a dancer at the ultra-exclusive and lavish annual Labor Day party thrown by DEFENDANT COMBS called the "White Party" and Mr. Gallo began his employment as a Sean John Model.

85.    PLAINTIFF's first employment at a "White Party" was on or about September 6, 2004.

86.     PLAINTIFF believed this to be a legitimate employment opportunity for her as a dancer.

87.     PLAINTIFF was picked up by Ms. Thomas from her home in New York through a car service owned by DEFENDANT COMBS or one of his affiliates and transported to DEFENDANT COMBS' estate in the Hamptons, New York, which served as the venue for the Labor Day "White Party."

88.     When PLAINTIFF arrived at DEFENDANT COMBS' Hamptons Estates with Ms. Thomas and other sex trafficked individuals, Ms. Thomas brought them into a room where they changed into clothes provided for them.

89.     PLAINTIFF was provided with a white, revealing uniform which she was required to wear as a condition of her employment at the party. She later learned that the uniforms she and other trafficking victims were forced to wear were color-coded to indicate to guests whether a victim was available for sexual exploitation. DEFENDANT COMBS would choose the uniform and color that girls would wear to indicate to the rest of the party goers that she was for sale as a sex slave.

90.     PLAINTIFF was also provided a separate room from the party, away from where the partygoers congregated, which was used by PLAINTIFF and other employees as a breakroom to take respite during the party as PLAINTIFF was there in an employment capacity. This is Ms. Thomas provided PLAINTIFF with drinks, wardrobe, and other necessities.

91.     DEFENDANT COMBS and Ms. Thomas strictly instructed PLAINTIFF that female employees were required to drink exclusively from specific DEFENDANT COMBS bottles of alcohol and champagne. PLAINTIFF was never allowed to pour her own drink, but rather was provided drinks by DEFENDANT COMBS or Ms. Thomas. Upon information and belief,

DEFENDANT COMBS laced these bottles with drugs which caused the female employees who imbibed to lose consciousness and sometimes become physically ill. Upon information and belief, DEFENDANT COMBS laced the liquor with ecstasy or another similar substance, which is why PLAINTIFF was provided with strict rules on which bottles she and other female employees were to drink from.

92.    While at the party, PLAINTIFF was instructed by Ms. Thomas to provide lap dances and act in a sexually flirtatious manner with the "White Party" guests. DEFENDANT COMBS also forcefully directed PLAINTIFF to specific guests she was required to focus her attention on.

93.    The parties hosted by DEFENDANT COMBS were notorious for the extensive quantities of illicit drugs present, with tables lined with substances such as pink and blue liquid cocaine, ketamine, pills, crack cocaine, fentanyl, and others. DEFENDANT COMBS openly boasted about his drug supply, claiming it to be the purest cocaine available sourced directly from the cartel. High-profile individuals, including celebrities, participated in or witnessed the vast array of drugs on display.

94.    On at least one occasion, DEFENDANT COMBS required PLAINTIFF to ingest narcotics provided by a "White Party" guest.

95.    At the first "White Party" in 2004, PLAINTIFF performed to the expectations of DEFENDANT COMBS who personally thanked her for her obedience and subsequently invited her for future employment at "White Parties" and other social events.

96.    PLAINTIFF was paid in cash by DEFENDANT COMBS through his agent and employee, Ms. Thomas.  at approximately 4-6 A.M., once the party had concluded.

97.    The first "White Party" in 2004 had no requirements for physical sexual contact and seemed to be a legitimate employment opportunity; so, when PLAINTIFF was offered

employment in the proceeding years at the Labor Day "White Party," she accepted them.

**PLAINTIFF's Employment at Subsequent White Parties**

98.    PLAINTIFF was employed as entertainment at subsequent "White Parties" in the Hamptons, New York. The "White Parties" inevitably transformed into "Freak Off" parties later in the evening. PLAINTIFF was required to perform commercial sex acts at these "Freak Offs" and function as entertainment for guests.

99.    PLAINTIFF was always transported to the Hamptons and other event locations by way of car service provided by either DEFENDANT COMBS or Ms. Thomas with a driver who was also an employee of DEFENDANT COMBS, and with DMs. Thomas also being present as liaison and coordinator between DEFENDANT COMBS and his employees.

100.    PLAINTIFF used phone numbers provided to contact either, or both, DEFENDANT COMBS and Ms. Thomas to arrange transportation to the "White Parties." This included using phone, text messaging, and email to confirm the date, time, and location of pick up.

101.    Ms. Thomas would then arrive at the location provided by PLAINTIFF, at the agreed date and time, in a chauffeured driven vehicle provided by, or under the control of DEFENDANT COMBS which would include Ms. Thomas, a member of DEFENDANT COMBS' security team and other employees who were hired as entertainment for the party.

102.    DEFENDANT and his associates went to great lengths to create the appearance of legitimacy for the parties, ensuring that there was press coverage, DJs, radio personalities, a street team, and other personnel present to give the events an above-board look.

103.    To further legitimize the events, DEFENDANT COMBS even hired a popular event coordinator to orchestrate the parties.

104.    This carefully crafted façade was designed to mislead potential victims into believing they were being hired for an ethical and legitimate opportunity, obscuring the illicit nature of the activities taking place, and making it easier to recruit and manipulate them. PLAINTIFF was always provided a wardrobe, and occasionally a wig, by Ms. Thomas and DEFENDANT COMBS, and also was provided a breakroom while attending the parties.

105.    Ms. Thomas and DEFENDANT COMBS groomed PLAINTIFF into sex trafficking over time.

106.    Around the third "White Party" PLAINTIFF was hired for, DEFENDANT COMBS and Ms. Thomas demanded PLAINTIFF engage in sexual intercourse with guests. PLAINTIFF was also forced to personally witness DEFENDANT COMBS and Ms. Thomas solicit and ingest narcotics and engage in illicit sex acts.

107.    Despite being forced by DEFENDANT COMBS, and his agents, to drink copious amounts of alcohol and consume illicit narcotics as part of her employment at the "White Parties", the sexual encounters PLAINTIFF was forced to endure were so excruciating that PLAINTIFF is haunted by the memory of them to this day.

108.    The level of intoxication PLAINTIFF was forced to reach each time was so severe that she and others received IV fluids to recover from the physical exertion and drug use. Twice, PLAINTIFF awoke to the IV fluids already being actively administered to her after the alleged events.  On one specific occasion, PLAINTIFF recalls waking up in the backseat of a car with the IV still in her arm, which remained there throughout the duration of the drive from the Hamptons to Manhattan.

109.    COMBS has a pattern of drugging victims to the point of unconsciousness and then being the one to provide assistance, either through himself directly or his associates —

reviving them from the drug-induced haze—so that they would remain dependent on him, thereby strengthening his control and ability to continue trafficking them. During the third "White Party", PLAINTIFF was provided a "black dress" to wear by Ms. Thomas and DEFENDANT COMBS, when previously PLAINTIFF was provided white clothing like other guests matching the theme of the party.

110.    Upon information and belief, PLAINTIFF was required to wear a black dress to the "White Party" not simply to denote her capacity as an employee, but more sinisterly as a sex trafficked sex worker who had been drugged and raped while unconscious by multiple guests at a previous party. This was unbeknownst to PLAINTIFF until 2024 when law enforcement made her aware of evidence documenting the abuse she endured while unconscious due to DEFENDANT drugging her.

111.    PLAINTIFF was required to wear the symbolic black dress on several occasions thereafter, in the Hamptons, Star Island, and elsewhere.

112.    PLAINTIFF's payment for her involvement included not only money, but also false promises of a record deal, music production, future event bookings, all amounting to fraud, and an assortment of drugs. Upon information and belief, DEFENDANT COMBS prefers to compensate his victims with drugs rather than cash, establishing and enabling a drug addiction and keeping them in a vulnerable state to facilitate continued abuse and perpetuate the trafficking cycle. DEFENDANT used his connections in the music industry to involve celebrities who would deliver the drugs. This served to glorify the addiction and further glamorize the trafficking activities, making the exploitation seem normalized and enticing.

**PLAINTIFF's Employment at Subsequent Events and "Freak Off Parties"**

113.    PLAINTIFF was employed as entertainment at subsequent events across the

country and PLAINTIFF was not always informed of the exact location. This included events at DEFENDANT COMBS' properties in Miami, Florida, another property in New Jersey, Justin's Restaurant in New York, the 4040 Club in New York, various hotels, and events hosted by DEFENDANT COMBS at properties owned by other associates of DEFENDANT COMBS. DEFENDANT COMBS hosted a party and subsequent "Freak Off" for nearly every award show, Fourth of July celebration, celebrity birthday party, and any other excuse he could find to host these parties.

114.    PLAINTIFF estimates that she attended upwards of 100 events as a sex trafficking victim for DEFENDANT COMBS. PLAINTIFF was trafficked at these events 2-3 times a month, on average.

115.    PLAINTIFF was also employed at the parties and subsequent "Freak Offs" that commenced at DEFENDANT COMBS' Miami, Star Island, residence in Florida. Upon arrival at Fort Lauderdale airport, a car service owned and operated by either DEFENDANT COMBS or one of his affiliates would retrieve PLAINTIFF, Ms. Thomas, and the other individuals from the airport and transport them to DEFENDANT COMBS' residence on Star Island.

116.    DEFENDANT would typically make announcements to partygoers, as midnight neared that the party would soon transform into a "Freak Off" party so that guests who desired to leave had the opportunity to do so. Upon information and belief, "Freak Offs" could last up to three days.

117.    PLAINTIFF recalls that when attending the Miami "White Parties", DEFENDANT COMBS maintained two adjacent homes. This allowed for the traditional party to occur without raising suspicion of the nefarious events that were happening simultaneously next door.

118.    On a separate occasion, PLAINTIFF was required to travel by plane from New York to Los Angeles to attend a party that DEFENDANT COMBS was co-hosting or otherwise involved in at the residence of, a renowned actor, comedian, and musician. PLAINTIFF was required to perform sex acts for DEFENDANT COMBS, just as she had at other events.

119.    On one occasion, PLAINTIFF was transported by bus to an unknown location, where she was subjected to a "Freak Off" event that lasted several days. Due to the severe intoxication and abuse she endured during this time, PLAINTIFF believed she had only been away for a few hours.

120.    On another occasion in or around 2013, PLAINTIFF recalls being transported from the Ontario airport in California to Las Vegas, Nevada by plane in order to attend a concert to entertain guests for DEFENDANT COMBS. After the concert, PLAINTIFF was required to perform commercial sex acts at the behest of DEFENDANT COMBS at a suite he had booked at the Wynn Hotel on the Las Vegas Strip. There, PLAINTIFF was forced to perform sex acts for participants in a high level poker tournament taking place in the hotel.

121.    On numerous occasions, DEFENDANT COMBS recorded videos of PLAINTIFF performing commercial sex acts at his command. PLAINTIFF recalls that when DEFENDANT COMBS did this, he often masturbated himself at the same time to satisfy his own prurient interests.

**Sexual Assault and Battery by DEFENDANT COMBS**

122.    While DEFENDANT COMBS primarily required PLAINTIFF to perform sex acts with his guests, DEFENDANT COMBS also raped PLAINTIFF on multiple occasions while she was unconscious due to the drugs and alcohol, he forced her to ingest.

123.    In addition, DEFENDANT COMBS groped, fondled, and made other unwanted,

nonconsensual contact with PLAINTIFF, both clothed and unclothed, on a near-constant basis when they were in the same location.

124.    DEFENDANT COMBS frequently participated in the sex acts PLAINTIFF was forced to commit by watching and masturbating at the same time.

**Blackmail Recordings**

125.    At the events following the first three White Parties, DEFENDANT COMBS, and Ms. Thomas passed PLAINTIFF around to other DEFENDANTS DOES to be sexually assaulted as part of their ongoing corrupt sex trafficking enterprise.

126.    Upon information and belief, DEFENDANT COMBS had hidden cameras in every room of his home in the Hamptons, New York, and Star Island, Miami, Florida.

127.    Upon information and belief, DEFENDANT DOES were filmed by DEFENDANT COMBS' hidden cameras sexually assaulting PLAINTIFF while PLAINTIFF was unconscious during the events in both New York and Florida.

128.    Upon information and belief, these individuals and PLAINTIFF were often recorded without their knowledge and consent for the purpose of creating blackmail to further DEFENDANT COMBS' sex trafficking enterprise, protect the enterprise from being exposed, and increase DEFENDANT COMBS' own power.

129.    On numerous occasions, PLAINTIFF recalls DEFENDANT COMBS recorded videos of PLAINTIFF performing commercial sex acts at his command with a handheld camcorder. PLAINTIFF recalls that when DEFENDANT COMBS did this.

130.    Upon information and belief, this evidence is in the custody of the Federal Bureau of Investigation, as the FBI executed a warrant and raided DEFENDANT COMBS residences in April 2024. Upon information and belief, whatever evidence was not successfully seized by the

FBI is still in the possession of DEFENDANT COMBS or one of his agents.

### DEFENDANT COMBS' Threats and Intimidation

131.    DEFENDANT COMBS used violence, threats, and intimidation to silence PLAINTIFF. He told PLAINTIFF on numerous occasions that if she ever spoke about any of the severe harm she had endured, he would destroy her career and he would kill her.

132.    PLAINTIFF was intimidated and threatened with death by DEFENDANT COMBS and DEFENDANT BBE throughout the decade that she was being trafficked and sexually exploited. DEFENDANT COMBS and DEFENDANT BBE made good on those threats, ransacking PLAINTIFF's home in 2004 and demonstrating the violence COMBS or associates at BBE would inflict on PLAINTIFF if she ever spoke out about her abuse.

133.    Upon information and belief, in retaliation for PLAINTIFF's escape, DEFENDANT COMBS ordered PLAINTIFF's then-boyfriend, Mr. Gallo, "blackballed" from the modeling industry and had all of Mr. Gallo's campaigns with SJE removed. Upon information and belief, in retaliation for PLAINTIFF's escape, DEFENDANT COMBS further had PLAINTIFF "blackballed" from the music and entertainment industry.

134.    More perniciously, DEENDANT COMBS continued to use force and threaten use of force against PLAINTIFF after 2010, in order to keep her under his control, and working within the sex trafficking venture. DEFENDANT COMBS had drugged PLAINTIFF so often when she was working within his sex trafficking venture that she developed an addiction. This non-consensual drugging of PLAINTIFF was DEFENDANT COMBS' preferred method of force, and threat of force, to coerce PLAINTIFF into performing commercial sex acts.

135.    Also, in or around 2010, after PLAINTIFF had begun to separate herself from the sex trafficking enterprise, upon information and belief, DEFENDANT COMBS tampered with

PLAINTIFF's vehicle by drilling a hole into the gas tank. When PLAINTIFF told police on the scene that she believed this was an intimidation tactic of DEFENDANT COMBS because she had escaped his trafficking ring, PLAINTIFF was taken into custody.

136.    Upon information and belief, DEFENDANT COMBS used his connections with law enforcement in San Bernardino, California to have PLAINTIFF taken into custody on a psychiatric hold for talking about the abuse she endured at DEFENDANT COMBS' hands. PLAINTIFF was led to believe that the only way she would be released was to recant any statements she made about knowing DEFENDANT COMBS.

137.    When PLAINTIFF was ultimately released, she was released into the care of DEFENDANT COMBS' personal attorney. The attorney, acting on behalf of DEFENDANTS COMBS and BBE, congratulated PLAINTIFF on finally denouncing any connection to DEFENDANTS COMBS and BBE at the mental health center, and claimed that "as a reward" for the apparent good behavior, she would be flown from Ontario, California, to Las Vegas, Nevada, to attend a concert with DEFENDANT COMBS. After the concert, she was sexually abused and offered to whomever DEFENDANT COMBS chose for her to perform commercial sex acts with that night.

138.    As a direct result of these threats and events, PLAINTIFF was coerced back into participating in DEFENDANT COMBS' sex trafficking enterprise.

139.    Throughout PLAINTIFF's time working for DEFENDANT COMBS, she was repeatedly and involuntarily drugged and poisoned.

140.    On at least one occasion, while at a birthday party event hosted by DEFENDANT COMBS, PLAINTIFF lent her lip gloss to another of DEFENDANT COMBS' affiliates. When it was returned to PLAINTIFF minutes later, PLAINTIFF used it and became extremely light-

headed, numb, and physically ill. Upon information and belief, DEFENDANT COMBS directed his affiliate to lace her lip gloss with a highly potent drug to poison PLAINTIFF.

141.    PLAINTIFF was also required to lather herself in an oil-like substance which produced numbing and tingling on PLAINTIFF's skin, and which impaired her ability to function. Upon information and belief, this oily substance was laced with a poisoning agent which eventually, through accumulation in her system, caused PLAINTIFF's skin to deteriorate– a condition which has not subsided to this day.

142.    PLAINTIFF also witnessed DEFENDANT COMBS and members of his organization, including but not limited to associates of BBE, CGE, and SJC, poison other women in the industry in ways that led to violent bodily reactions. PLAINTIFF was also privy to information disclosed by DEFENDANT COMBS regarding his violence towards other women when they crossed him, which added to the prolonged duress and fear PLAINTIFF endured.

143.    In 2014, PLAINTIFF endured an extreme assault by four to five people who had been waiting for her outside of her newfound place of work. They jumped out of a van wearing hoods and began punching and beating her, shouting threats like "This is from Bad Boy, Bitch!" and "Don't mess with Bad Boy, Bitch!" PLAINTIFF did her best to fight off her assailants but received the message clearly that she was not to speak about her abuse by DEFENDANT COMBS or she would be hurt or killed by DEFENDANTS COMBS and BBE. As a result, and in order to protect her newborn son, she again found courage to leave COMBS' trafficking ring.

144.    After PLAINTIFF escaped the trafficking enterprise, she perceived every mysterious death of people she believed was connected to DEFENDANT COMBS as a further threat against PLAINTIFF's life and that of her son. It was not until DEFENDANT COMBS was taken into custody that PLAINTIFF felt safe enough to come forward with her claims.

145.    This perception has proven accurate because since the last assault in 2014, PLAINTIFF has consistently received direct threats from DEFENDANT COMBS or his agents acting on his behalf. These threats persisted until approximately November of 2024. The threats are typically made in the form of text messages or are delivered in person by individuals who DEFENDANT COMBS hires to stalk PLAINTIFF and intimidate her.

146.    COMBS hires people to surveil, stalk, and verbally harass and intimidate PLAINTIFF. DEFENDANT DOES are usually male, and consistently deliver the message that PLAINTIFF is "lucky to be walking on a bridge instead of water," meaning that she is lucky to be breathing air on land rather than drowning underwater.

147.    Other threats sent to PLAINTIFF's phone have said COMBS and his associates would find her and that she would be "dealt with" if she ever attended a party associated with DEFENDANT COMBS again.

148.    One such agent of DEFENDANT COMBS has identified himself to PLAINTIFF as a leader in the Cripps, a prolific, violent gang organization associated with DEFENDANT COMBS. This particular agent was the most recent to make threats against PLAINTIFF, threatening to "Off" her in November 2024 if she continued to pursue her claims against DEFENDANT COMBS.

**DEFENDANT COMBS' Corrupt Sex and Drug Trafficking Organization Has Caused PLAINTIFF Lifelong Harm**

149.    PLAINTIFF became severely depressed and began to blame herself for being trafficked.

150.    Being sex trafficked and abused led PLAINTIFF into a tailspin of anxiety and depression.

151.    In the ensuing years, PLAINTIFF has also experienced alcohol and drug

addiction, as she dealt with dependencies DEFENDANT COMBS created through forced consumption at events and by attempting to cope with the emotional trauma of being assaulted and trafficked.

152.    PLAINTIFF has also experienced intimacy issues as she struggles to maintain emotional and romantic relationships with men.

153.    DEFENDANT COMBS has altered the trajectory of PLAINTIFF's career, denying her a successful and lucrative career in the music industry.

154.    To this day, PLAINTIFF experiences bouts of depression, anxiety, body image issues, feelings of worthlessness, and intimacy issues as a direct and foreseeable result of being trafficked by DEFENDANT COMBS.

155.    PLAINTIFF is a woman of faith, and when she saw news coverage of the countless lawsuits, initiated by brave other individuals against DEFENDANT COMBS, she felt she had a moral obligation to speak out, and finally felt safe enough to do so with DEFENDANT COMBS behind bars.

156.    PLAINTIFF feared further violence and/or retaliation from DEFENDANT COMBS in filing this lawsuit, but ultimately decided that she needed to speak her truth with the hopes that no other individual would have to endure the egregious and heinous treatment she had.

157.    PLAINTIFF seeks justice for herself and all other DEFENDANT COMBS' victims.

### COUNT I
### VIOLATION OF TRAFFICKING VICTIMS PROTECTION ACT
### CODIFIED AT 18 U.S.C. § 1595
### (Against All DEFENDANTS and DOES 1-500)

### *Perpetrator Liability*

158.    PLAINTIFF incorporates by reference each and every prior paragraph of this

Complaint as though set forth in full in this cause of action.

159.    DEFENDANT COMBS, in and affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and solicited PLAINTIFF, knowing or in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, as described in Title 18, United States Code, Section 1591(e)(2), were used to cause PLAINTIFF to engage in commercial sex acts on numerous occasions, in violation of Title 18, United States Code, Section 1591(a)(l) and (b)(l).

160.    An individual who is a victim of a violation of 18 U.S.C. § 1591 may bring a civil action against their perpetrator under 18 U.S.C § 1595.

161.    DEFENDANT COMBS, directly and via his agent Ms. Thomas, knowingly recruited, enticed (by promising career advancement, legitimate employment, and financial support), transported (most often by car service and commercial flights), provided (by making her available to guests as a sex worker), advertised (especially by requiring PLAINTIFF to wear a uniform which indicated PLAINTIFF's sexual availability to partygoers), maintained (by frequent requests that PLAINTIFF return to his social events), patronized (by providing PLAINTIFF with a uniform and monetary compensation), and solicited (by providing things of value in exchange for sex) PLAINTIFF with the intent that she perform commercial sex acts.

162.    DEFENDANT COMBS lured PLAINTIFF into sex trafficking with the false misrepresentation of sponsoring a successful music career for her, introducing her to music executives who could help advance her career and otherwise make her a music star. However, COMBS never intended to make good on such promises. He knew such promises were false. He intended to deceive PLAINTIFF into believing and relying on the promise COMBS would advance her career in order to cause PLAINTIFF to engage in a commercial sex act. Such conduct

constitutes fraud.

163.    DEFENDANT COMBS further threatened PLAINTIFF through years of nonconsensual sexual assault, forced intoxication, forced alcohol and drug dependence, threats to PLAINTIFF's physical safety, and actual physical assault of PLAINTIFF. These threats of serious harm to and physical restraint against PLAINTIFF further constituted a scheme, plan, or pattern intended to cause PLAINTIFF to believe that failure to perform the sexual acts she was forced to commit by COMBS would result in serious harm to or physical restraint against her and her son. Indeed, they did.

164.    Thus, DEFENDANT COMBS engaged in acts that constitute force, threats of force, fraud and coercion to cause PLAINTIFF to engage in countless commercial sex acts.

165.    DEFENDANT COMBS forced PLAINTIFF to engage in sexual intercourse and related sexual acts in exchange for drugs and money, which qualifies as a commercial sex act.

166.    PLAINTIFF must only show the trafficking had a de minimis effect on interstate commerce. It was DEFENDANT COMBS' pattern and practice to use the channels and instrumentalities of interstate commerce (vehicles, yachts and commercial airplanes) to entice, recruit, solicit, harbor, provide, obtain, and transport individuals, like the PLAINTIFF, across state lines, for purposes of causing commercial sex acts, in violation of 18 U.S.C. § 1591(a)(1).

167.    DEFENDANT COMBS is also directly liable for sex acts that he, via himself or his agents acting on his behalf, paid for, whether or not he perpetrated the sex act. He remains liable for sex acts that he paid for which were perpetrated by other individuals, as he engaged in procuring the commercial sex act.

168.    All DOES who engaged in sexual relations with PLAINTIFF through force, threats of force, fraud or coercion in connection with DEFENDANT COMBS, are also in violation

of 18 U.S.C, § 1591.

169.    Thus, perpetrators DEFENDANT COMBS, and DEFENDANT DOES are liable pursuant to § 1591(a)(1) and PLAINTIFF is entitled to bring this civil action pursuant to § 1595(a).

### *Knowing Beneficiary Liability*

170.    Separate from perpetrator liability, 18 U.S.C. § 1591(a)(2) also holds persons or entities liable for sex trafficking who knowingly benefit, or attempt or conspire to benefit, financially or by receiving anything of value from participation in a venture, which that person knew or should have known has engaged in sex trafficking.

171.    A venture is commonly understood as an undertaking involving risk, which is established by two or more individuals and need not be a legal partnership.

172.    The Combs Enterprise, including its leadership, its members, and its associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961 (4), that is, a group of individuals associated in fact, although not a legal entity. The Combs Enterprise consisted of: (i) DEFENDANT COMBS; (ii) entities within the Combs Enterprise, including but not limited to BBE, SJC, CGE; (iii) individuals employed by and associated with the Combs Enterprise; and (iv) DEFENDANT DOES.

173.    The Combs Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Combs Enterprise. The Combs Enterprise was engaged in, and its activities affected, interstate and foreign commerce. The Combs Enterprise operated in the Southern District of New York and elsewhere.

174.    At all times relevant, DEFENDANT COMBS was the leader of the Combs Enterprise.

175.    Participation in a venture means "knowingly assisting, supporting, or facilitating a

violation" of the perpetrator's liability under § 1591(a)(1).

176.    DEFENDANTS BBE, SJC, CGE, and DOES 1-500 engaged in a venture as follows:

    a.    DEFENDANTS provided DEFENDANT COMBS with unfettered access to resources in their control which made the sex trafficking enterprise possible. Enabling DEFENDANT COMBS with significant, unmonitored resources caused DEFENDANTS to receive the benefits detailed throughout this Complaint. DEFENDANTS' willingness to provide significant, unmonitored resources to DEFENDANT COMBS was the quid pro quo for it receiving the benefits detailed herein.

    b.    BBE participated in DEFENDANT COMBS' sex trafficking venture by providing DEFENDANT COMBS with access to A-List clientele, legitimizing DEFENDANT COMBS' fraudulent and coercive offers of career advancement in exchange for nonconsensual sexual acts, and sponsoring the parties which DEFENDANT COMBS used for sex trafficking, including White Parties and Freak Offs where PLAINTIFF ENGLISH was trafficked. BBE benefited from its participation in the sex trafficking enterprise because of its association with DEFENDANT COMBS, which helped to draw more top-tier talent to join the label as well as improved record sales simply by its connection to DEFENDANT COMBS' personal reputation in the entertainment industry. BBE further benefited by receiving free labor from DEFENDANT COMBS' victims, who were dancers at different promotional events. Upon information and

belief, DEFENDANT BBE participated and benefited from the sex trafficking venture in further ways not yet known to PLAINTIFF, but which will be learned during the course of discovery.

c.    SJC tailored its practices to provide DEFENDANT COMBS with opportunities to scout for potential victims through modeling casting calls, which gave DEFENDANT COMBS a legitimate cover to hunt for potential victims, including PLAINTIFF ENGLISH through her former boyfriend, Anthony Gallo. SJC was aware that DEFENDANT COMBS was using its modeling casting calls as hunting grounds for potential victims, as models were commonly asked to perform sex acts on DEFENDANT COMBS' behalf during the modeling events, as in the case of PLAINTIFF's partner, Gallo. Despite their knowledge, SJC continued to participate in the trafficking venture, enabling its existence and long-term success. SJC benefited from its participation in the sex trafficking enterprise because of its association with DEFENDANT COMBS, which helped to draw more top-tier talent to model clothing as well as improved sales simply by its connection to DEFENDANT COMBS' personal reputation in the entertainment industry. SJC further benefited by receiving free labor from DEFENDANT COMBS' victims, who were dancers at different promotional events. Upon information and belief, DEFENDANT SJC participated and benefited from the sex trafficking venture in further ways not yet known to PLAINTIFF, but which will be learned during the course of discovery.

d.    CGE participated by not only providing DEFENDANT COMBS with financial means to conduct the sex trafficking enterprise, but additionally provided cover for the events he most notoriously used for sex trafficking, including sponsoring the lavish parties like the White Parties which eventually turned into Freak Offs. Upon information and belief, CGE further participated by providing DEFENDANT COMBS and his associates at these parties with alcohol like Ciroc Vodka and DeLeon Tequila, both of which are owned and produced by CGE, and which were used in excess and in combination with illicit drugs to incapacitate trafficking victims, including PLAINTIFF. CGE benefited from its participation in the sex trafficking enterprise because of its association with DEFENDANT COMBS, which helped to improve sales simply by its connection to DEFENDANT COMBS' personal reputation in the entertainment industry. CGE further benefited by receiving free labor from DEFENDANT COMBS' victims, who were dancers at different promotional events. Upon information and belief, DEFENDANT CGE participated and benefited from the sex trafficking venture in further ways not yet known to PLAINTIFF, but which will be learned during the course of discovery.

177.    Upon information and belief, the resources provided, financial, narcotic, and otherwise, were necessary for DEFENDANT COMBS to successfully coerce PLAINTIFF into engaging in commercial sex acts.

178.    Upon information and belief, the unchecked resources that DEFENDANTS provided went far beyond providing routine partnership or compensation to a general business

partner. Far from routine, DEFENDANTS provided substantial marketing and recruitment resources to DEFENDANT COMBS for years in his business ventures.

179.    DEFENDANTS had constructive knowledge of DEFENDANT COMBS' sex trafficking Enterprise because of specific acts by DEFENDANT COMBS that put it on notice of a particular and ongoing sex trafficking Enterprise. Among the specific acts were DEFENDANT COMBS' "White Party" events that representatives of DEFENDANT COMBS periodically attended. DEFENDANT COMBS had narcotics and sex workers present in circumstances that should have prompted DEFENDANTS and its agents to raise questions about DEFENDANT COMBS' sex trafficking, and/or if he was using the resources provided to him by DEFENDANTS to continue such Enterprise. By ignoring numerous "red flags" about DEFENDANT COMBS' sex trafficking activity, DEFENDANTS benefited by improving their image, connections, power, popularity, and sales due to the exclusive experience the sex trafficking venture created at the "Freak Offs" and "White Parties." "White Parties" also garnered legitimacy, immense success, and access to top and emerging artists, celebrities, famous athletes, political figures, musicians, and international dignitaries.

180.    Upon information and belief, DEFENDANTS' actions extend well beyond a situation of failing to train themselves and their staff about recognizing the warning signs of sex trafficking. Upon information and belief, indeed, DEFENDANTS' employees knew of and knowingly participated in DEFENDANT COMBS' sex trafficking enterprise. DEFENDANTS undoubtedly knew that DEFENDANT COMBS was the kingpin of a wide-reaching, lucrative, and powerful sex trafficking enterprise.

181.    DEFENDANT COMBS and DEFENDANT COMBS-controlled entities used the marketing and resources they received from their general business partners to facilitate their sex

trafficking enterprise. DEFENDANT COMBS benefited from his general business partners' apparent willful blindness through their willingness to provide substantial resources in suspicious circumstances. Additionally, with funds provided by DEFENDANT entities, DEFENDANT COMBS was able to blackmail individuals, which he could later exchange for something of value.

182.    By their participation in DEFENDANT COMBS' sex trafficking enterprise, DEFENDANTS perpetuated PLAINTIFF's abuse for years.

183.    DEFENDANTS' knowing and intentional conduct caused PLAINTIFF serious harm including, without limitation, physical, psychological, emotional, financial, and reputational harm. PLAINTIFF experienced physical, emotional, and psychological injuries for which she is entitled to monetary damages and other relief. PLAINTIFF experienced physical injuries as a result of repeated nonconsensual, intoxicated sexual contact with others. As a result of being trafficked against her will, PLAINTIFF has experienced severe emotional distress and injuries, including anxiety, depression, nightmares, flashbacks, distrustfulness, mental anguish, suicidal ideations, intrusive thoughts, faith crises, low self-esteem and self-worth, and overall helplessness.

184.    The conduct of DEFENDANTS, and each of them, constituted a knowing and intentional violation of 18 U.S.C § 1591(a)(1), and § 1595, entitling PLAINTIFF to punitive and treble damages.

## COUNT II
### SEXUAL ASSAULT AND SEXUAL HARASSMENT
### (Against DEFENDANT COMBS, and DOES 1-500)

185.    PLAINTIFF incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

186.    As described herein, on numerous occasions DEFENDANT COMBS himself directly raped, assaulted, and sexually abused PLAINTIFF. In addition, he masturbated, recorded,

and watched while other DEFENDANTS raped and sexually assaulted PLAINTIFF. Finally, COMBS masterminded the sex trafficking and sexual assault of PLAINTIFF by other DEFENDNATS herein. He frightened and placed PLAINTIFF in apprehension of harm when he forced and coerced PLAINTIFF to engage in sex work for him, against her will, during his "White Parties" from 2004-2009 at his homes in Miami, Florida and the Hamptons, New York.

187.    As described herein, affiliates of COMBS forcibly touched and attempted to touch PLAINTIFF's intimate areas and/or touched PLAINTIFF with their own intimate body parts. Upon information and belief, COMBS' affiliates touched PLAINTIFF's intimate areas while PLAINTIFF was unconscious from forced narcotics use by DEFENDANT COMBS. DEFENDANT COMBS and/or Ms. Thomas failed to intervene.

188.    As a result of DEFENDANT's conduct, and each of them, PLAINTIFF has suffered and continues to suffer harm, including physical injury, severe emotional distress, humiliation, anxiety, and other consequential damages for which she is entitled to an award of monetary damages and other relief.

189.    The conduct of DEFENDANTS, and each of them, was willful, wanton, and malicious. At all relevant times, DEFENDANT DOES acted with conscious disregard for PLAINTIFF's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to PLAINTIFF, and intended to cause fear, physical injury and/or pain and suffering to PLAINTIFF. By virtue of the foregoing, PLAINTIFF is entitled to recover punitive damages.

## COUNT III
### THE NYC VICTIMS OF GENDER-MOTIVATED VIOLENCE PROTECTION ACT
### (Against All DEFENDANTS)

190.    PLAINTIFF incorporates by reference all preceding paragraphs and re-alleges

them as if set forth fully herein.

191.    The NYC Gender Motivated Violence Act revives any claims against "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104. Pursuant to § 10-1105(a), this cause of action is timely because it commenced within "two years and six months after September 1, 2022."

192.    The herein described conduct of DEFENDANT COMBS, Ms. Thomas and DOES, including raping PLAINTIFF, forcing PLAINTIFF to engage in commercial sex acts, drugging PLAINTIFF, and beating PLAINTIFF, constitutes multiple crimes of violence against PLAINTIFF and are "crimes of violence motivated by gender," as defined in N.Y. C. Admin Code § 10-1103.

193.    DEFENDANTS' crimes of violence were motivated by PLAINTIFF's gender as defined in in the New York City Administrative Code § 8-903, as DEFENDANTS committed or facilitated forcible sex acts upon PLAINTIFF that would constitute felonies under state law and as the conduct presents a serious risk of physical injury, whether or not those acts have resulted in criminal charges, prosecution, or conviction. Sexual assault is an act of gender-motivated violence under the law. Malice or ill will based on gender is apparent from the alleged commission of the act itself.

194.    The described conduct herein of DEFENDANTS constitutes sexual offenses as defined in Article 130 of the New York Penal Law. PLAINTIFF is a woman, who is older than 18, who alleges misdemeanor and/or felony penal law violations, including but not limited to sexual misconduct (N.Y. Penal L. § 130.20), criminal sexual act in the first degree (N.Y. Penal L. § 130.50), criminal sexual act in the third degree (N.Y. Penal L. § 130.40), forcible touching (N.Y.

Penal L. § 130.52), sexual abuse in the first degree (N.Y. Penal L. § 130.65), sexual abuse in the

second degree ((N.Y. Penal L. § 130.60), sex trafficking (N.Y. Penal L. § 230.34), and human

trafficking (18 U.S.C. § 1591).

195.    DEFENDANT COMBS demanded PLAINTIFF drink drug-laced alcohol while

in her employment capacity as entertainment at the "White Party." PLAINTIFF was never allowed

to pour her own drink, but rather was provided drinks by one of DEFENDANT COMBS' agents,

Ms. Thomas, who upon information and belief, laced the drinks with drugs to incapacitate

PLAINTIFF. In addition, PLAINTIFF was patently under the influence of drugs and alcohol.

Thus, DEFENDANTS knew or should have known that PLAINTIFF was incapable of consenting

to sexual contact and/or sexual conduct.

196.    As alleged herein, several of these events specifically occurred in the city of New

York. DEFENDANT COMBS demanded PLAINTIFF attend and work various New York award

show and event after parties, during which she was drugged via laced drinks in order to

incapacitate her in order to have her engage in sexual contact and/or sexual intercourse with

DEFENDANT COMBS and others, despite her refusal and unwillingness to do so.

197.    DEFENDANTS' actions presented a serious risk of physical injury to

PLAINTIFF's person.

198.    Furthermore, DEFENDANTS BBE, SJC, and CGE enabled DEFENDANT

COMBS' commission of the crimes of violence motivated by gender, and thus, are liable under

the NYC Victims of Gender-Motivated Protection Act.

199.    DEFENDANTS BBE, SJC, and CGE enabled or participated in the sexual

trafficking of PLAINTIFF because DEFENDANTS failed to, among other things, protect

PLAINTIFF from a known danger; implement sufficient policies and procedures in place to

prevent sexual assault; properly implement policies and procedures to prevent sexual assault; take reasonable measures to ensure that policies to prevent sexual assault were working; train their employees on identifying sexual assault and inappropriate workplace behaviors; protect their employees from sexual assault; and adhere to the applicable standard of care.

200.    DEFENDANTS BBE, SJC, and CGE knew, or should have known, that DEFENDANT COMBS posed a risk of sexual violence, assault, harassment and trafficking and was not fit to be in a position of authority. Thus, DEFENDANTS BBE, SJC, and CGE enabled the sexual trafficking of PLAINTIFF by actively maintaining and employing DEFENDANT COMBS in a position of power and authority over people, including PLAINTIFF.

201.    DEFENDANTS BBE, SJC, and CGE failed to properly supervise DEFENDANT COMBS and protect PLAINTIFF from a known danger, and thereby enabled DEFENDANT COMBS' sexual trafficking of PLAINTIFF.

202.    As a direct and proximate result of the aforementioned crime of violence and gender- motivated violence, PLAINTIFF has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys' fees and costs, and other remedies as this Court may deem appropriate damages, as set forth in § 10-1104.

**COUNT IV**
**NEGLIGENCE**
**(Against all DEFENDANTS)**

203.    PLAINTIFF incorporates by reference all preceding paragraphs and re-alleges them as if set forth full herein.

204.    DEFENDANTS owed a duty of reasonable care to PLAINTIFF.

205.    DEFENDANTS BBE, SJC, and CGE had a duty of care to supervise DEFENDANT COMBS and are liable for injuries caused by his conduct. Furthermore, DEFENDANTS COMBS had a duty of care in the supervision, hiring, and retention of Ms. Thomas. In addition, DEFENDANTS owed a special duty to their employee PLAINTIFF.

206.    DEFENDANTS, and each of them, breached the duty of reasonable care owed to PLAINTIFF by intentionally and recklessness disregarding the risk of sexual abuse suffered by PLAINTIFF at parties and events hosted by COMBS and DEFENDANTS.

207.    By continuously placing DEFENDANT COMBS in positions of authority and failing to take action despite knowing, or should have known, that COMBS was sexually assaulting and trafficking his victims, DEFENDANTS BBE, SJC, and CGE breached their duty to PLAINTIFF and as a result, PLAINTIFF was injured.

208.    DEFENDANT COMBS breached his duty to PLAINTIFF by failing to properly supervise, hire, and retain Ms. Thomas despite knowing, or should known, that she was facilitating and participating in sexual trafficking and sexual assaults. As a result of DEFENDANT COMBS' negligence, PLAINTIFF was injured.

209.    As PLAINTIFF's employers, DEFENDANTS breached their duty to provide a safe workplace for PLAINTIFF. DEFENDANTS used PLAINTIFF's employment as a means to pimp her out and subject her to sexual assaults. While working at DEFENDANTS' "White Parties," PLAINTIFF was consistently drugged to the point of unconsciousness and DEFENDANTS specifically chose attire for PLAINTIFF that would single her out as a target for predators at the parties. As a result of DEFENDANTS' negligence, PLAINTIFF suffered injuries.

210.    As a direct and proximate result of the aforementioned crime of violence and gender- motivated violence, PLAINTIFF has sustained and will continue to sustain, monetary

damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

**COUNT V**
**PREMISES LIABILITY FOR THE SEXUAL ASSAULT COMMITTED BY**
**DEFENDANT DOES 1-500**
**(Against DEFENDANT COMBS)**

211.    PLAINTIFF incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

212.    PLAINTIFF was sex trafficked to DEFENDANTS DOES 1-500 at the "White Parties" from 2004-2009his homes in Hamptons, New York, and Star Island, Miami, Florida. PLAINTIFF was also sex trafficked to DEFENDANTS DOES 1-500 in DEFENDANT COMBS' New York City property, after award shows, during his after parties. DEFENDANT COMBS was present, along with other high-profile individuals, while PLAINTIFF was being assaulted by DEFENDANT DOES 1-500 during the parties. PLAINTIFF was legally on the premises as an employee or agent of DEFENDANTS COMBS, BBE, SJC, and CGE, employed for the purpose of dancing at parties and performing commercial sex acts for guests. DEFENDANT DOES 1-500 was legally on the premises owned by DEFENDANT COMBS as a guest and invitee of DEFENDANT COMBS.  DEFENDANT COMBS owned the premises and had dominion and control over the premises where PLAINTIFF was harmed. DEFENDANT COMBS had dominion and control over the actions of DEFENDANT DOES 1-500 and failed to step in and stop DEFENDANT DOES 1-500 from sexually assaulting PLAINTIFF.

213.    As the property owner, DEFENDANT COMBS had a duty to protect PLAINTIFF from the harm she suffered at the hands of DEFENDANT JACOB. DEFENDANT COMBS breached his duty when he failed to stop DEFENDANT DOES 1-500 from sexually assaulting PLAINTIFF. In furtherance of this breach, DEFENDANT COMBS demanded and encouraged

DEFENDANT DOES 1-500, to assault PLAINTIFF. PLAINTIFF has suffered immensely because of DEFENDANT COMBS' intentional breach of his duty.

214.    As alleged herein, as a result of DEFENDANT COMBS' breach of his duty, PLAINTIFF has suffered and continues to suffer harm, including severe emotional distress, anxiety, and other consequential damages, for which she is entitled to an award of monetary damages and other relief.

## COUNT VI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – SEX TRAFFICKING
### (against ALL DEFENDANTS)

215.    PLAINTIFF incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

216.    DEFENDANTS, and each of them, created an unreasonable risk of causing emotional distress to PLAINTIFF, and DEFENDANTS, and each of them, knew or should have known that sexual abuse was likely to result in emotional distress that might and/or likely would cause illness or bodily harm.

217.    PLAINTIFF's emotional distress was foreseeable to DEFENDANTS, and each of them.

218.    As alleged herein, as a direct and proximate result of the negligent conduct of DEFENDANTS, and each of them, PLAINTIFF suffered and will continue to suffer severe emotional distress.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – SEX TRAFFICKING
### (Against All DEFENDANTS)

219.    PLAINTIFF incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

220.    DEFENDANTS, and each of them, engaged in conduct toward PLAINTIFF that

was extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault and misconduct.

221.    The sexual assault, trafficking and misconduct by DEFENDANTS, and each of them, were extreme and outrageous conduct that shocks the conscience.

222.    These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

223.    As a direct and proximate result of DEFENDANTS', and each of them, extreme and outrageous conduct, PLAINTIFF has suffered severe emotional distress.

**COUNT VIII**
**BATTERY**
**(Against DEFENDANT COMBS, DEFENDANT BBE, and DEFENDANT DOES)**

224.    PLAINTIFF incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

225.    DEFENDANT COMBS, DEFENDANT BBE, and DEFENDANT DOES engaged in intentional, harmful, and offensive contact against PLAINTIFF without her consent on numerous occasions.

226.    Upon information and belief, this included forcing PLAINTIFF to ingest drugs without her knowledge through liquor laced with narcotics.

227.    Upon information and belief, this additionally included sending BBE affiliates to threaten and physically attack PLAINTIFF in 2014.

228.    These actions were taken with the intent to cause intentional, harmful, and offensive contact with PLAINTIFF.

229.    DEFENDANTS' conduct was wanton, malicious, willful, and/or cruel, entitling the PLAINTIFF to punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, PLAINTIFF respectfully requests that judgment be entered against DEFENDANTS as follows:

a.  Award PLAINTIFF damages against DEFENDANTS, in an amount to be determined at trial, plus prejudgment interest, to compensate PLAINTIFF for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

b.  Award PLAINTIFF damages against DEFENDANTS in an amount to be determined at trial, plus prejudgment interest, to compensate PLAINTIFF for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

c.  Award PLAINTIFF punitive and exemplary damages, in an amount to be determined at trial;

d.  Award prejudgment and postjudgment interest on all amounts due;

e.  Award of costs that PLAINTIFF has incurred in this action, including, but not limited to, expert witness fees, as well as PLAINTIFF's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

f.  Any such other and further relief as the Court may deem just and proper.

## JURY DEMAND

PLAINTIFF hereby demands a trial by jury on all issues of fact and damages stated herein,

so triable, pursuant to Fed. R. Civ. P. 38 and the 7th Amendment to the United States Constitution.

Dated: January 8, 2025

*/s/ Joel M. Taylor*
Joel M. Taylor
KAGEN, CASPERSEN & BOGART LLP
551 Madison Ave, 12th Floor
New York, NY 10022
Tel: (212) 880-2045
Email: jtaylor@kcbfirm.com

-and-

Anne Andrews (pro hac vice application forthcoming)
Sean T. Higgins (pro hac vice application forthcoming)
Kimberly DeGonia (pro hac vice application forthcoming)
Ryan McIntosh (pro hac vice application forthcoming)
Leilah Rodriguez (pro hac vice application forthcoming)
ANDREWS & THORNTON
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Emails:
Survivor@andrewsthornton.com
Aa@andrewsthornton.com
Shiggins@andrewsthornton.com
Kdegonia@andrewsthornton.com

*Counsel for Plaintiff*